Reese, J.,
delivered the opinion of the court.
1. We will consider the nature of the interest, which the defendants had, as the Trustees of the Union Street Lottery, by virtue of the provisions of the act of 1831, c. 69, (private acts) for the purpose of ascertaining whether art. 11, § 5, of the reformed constitution, or the 47 ch. of the acts of 1835, passed in pursuance thereof, can be held to have legally terminated that interest.
So early as 1809, c. 39, the drawing of a lottery within this State was prohibited by legislative enactment and by the infliction of severe penalties. By judicial construction upon that act, and the several acts to prevent and punish gaming, all persons concerned in lotteries were held.to be guilty of gaming and to be punished by indictment as for that offence. *426 Lotteries then stood reprobated by legislative enactment and by judicial decision, as contrary to public policy, and to good morals; and a wise and enlightened public sentiment every where sustained the enactment and the decision.
Under such circumstances, we ask, what was conferred upon the defendants by the act of 1831, c. 69? Nothing, certainly, but an immunity, in that particular instance, and for the specified object, from penalties and indictments; an indulgence granted to them to perform acts which were, in general, held to be against public policy and good morals; a permissionfto do that, for the doing of which, all others would have been subjected to fine and imprisonment. If, then, before the defendants had done any thing under the act of 1831, this privilege conceded to them, of gaming, without liability to criminal prosecution until they had realised a specified amount of profits, had been abrogated by a subsequent legislature, and they had been placed upon the same ground with all other citizens, of what could they have complained? Could they have, on just grounds, alledged that a contract had been impaired, or aright divested? See 3 Story, § 1379, 1385. For this, surely, no one will contend. If, then, they had organised a scheme, and had drawn one or more classes of the lottery, as the bill alleges was done, and so to speak, one or. two games had been played and finished; and the legislature finding a pause in their proceedings, when no purchaser of a scheme and no holder of a ticket could be injuriously affected, and availing themselves of this pause, had prohibited the further exercise of this extraordinary privilege, could the defendants he heard to object to the prohibition upon the ground that they had not realised all the profits which they bad been promised, and which they expected? Certainly not.
2. In the precise state above supposed stood this matter, when die Convention, in 1834, adopted the fifth section of the eleventh article of the reformed constitution, in which they provide, that the legislature “shall pass laws to prohibit the sale of lottery tickets in this state.” This was itself a prohibition, and was announced to the complainants before the formation of their contract with the defendants. And again, although that contract is dated before the act of 1835, *427 c 47, yet, neither the bill nor the answer alledges that the complainants, before the passage of that act, were at any trouble, made any advances, or incurred any liability whatever. They are therefore in no better situation with regard to the repealing law, than the defendants.
3. If we had taken a different view of both the points above, discussed, still we could by no means have decreed a specific execution of the contract, and ordered the drawing of a lottery, which might, under the provisions of the act of 1835, c 47, have subjected hundreds of our citizens, the drawers of the lottery, the vendors of tickets, the parties, publishers, and circulators of the scheme, and even the ticket holders themselves, to prosecution by indictment.
A court of chancery in such case, upon the clearest principles, would leave the parties to enforce, or to abandon their rights and remedies at law, as to them might seem best.
Let the decree be affirmed.